THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS TOOL WORKS INC.,     )
)
*Plaintiff,*    )
)
)    No. 20 C 5416
v.    )
)    Judge Virginia M. Kendall
TERMAX LLC,    )
)
*Defendant.*    )
)

## MEMORANDUM OPINION AND ORDER

Plaintiff Illinois Tool Works Inc. (ITW) claims Defendant Termax, LLC infringed its patents on plastic automobile fasteners. (Dkt. 105). Termax has counterclaimed, alleging ITW's patents are unenforceable, including for inequitable conduct. (Dkt. 108). ITW moves to dismiss Termax's Counterclaim in part, alleging Counts V and VI—claiming unenforceability for inequitable conduct—fail to state a claim. (Dkt. 112). ITW also moves to strike certain factual allegations from Termax's Counterclaim. (*Id.*) For the reasons below, ITW's motions [112] are granted.

## BACKGROUND

In resolving ITW's motion to dismiss, the factual allegations taken from Termax's Counterclaim (Dkt. 108) are assumed true. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). The Court assumes familiarity with its prior Opinion resolving motions to dismiss by Termax and LISI Automotive SA. (Dkt. 48); *Ill. Tool Works Inc. v. Termax LLC*, 2021 WL 1239215 (N.D. Ill. Apr. 2, 2021).

1

ITW manufacturers push-in type W-base retainers or fasteners, designed to secure automobile components. (Dkt. 105 ¶ 9). Ideally, these fasteners should minimize the gap between the components they hold together. (*Id.* at ¶ 10). Termax—a competitor in the automotive-fastener industry—makes and sells "Plastic Bird Beak Sealing Fasteners." (*Id.* at ¶¶ 20–21). According to ITW, Termax's fasteners infringe two patents: (1) U.S. Patent No. 11,578,740 (the '740 Patent), entitled "Push Through Retainer Connection with Integrated Hinging Seal," and (2) U.S. Design Patent No. D897,826 (the D'826 Patent), entitled "Fastener." (*Id.* at ¶¶ 28–65).

ITW sued Termax and its French affiliate in September 2020, alleging infringement of a predecessor to the '740 Patent, U.S. Patent No. 10,683,882 (the '882 Patent), also entitled "Push Through Retainer Connection with Integrated Hinging Seal," and the D'826 Patent. (Dkts. 1, 11). On April 2, 2021, ruling on Defendants' motion to dismiss ITW's amended complaint, the Court dismissed ITW's claims against LISI, while allowing ITW's claims against Termax to proceed. (Dkt. 48); *Ill. Tool Works*, 2021 WL 1239215. At the end of April 2021, the Court granted Termax's unopposed motion to stay this case pending resolution of its *inter partes* review (IPR) petition challenging ITW's '882 Patent before the United States Patent Trial and Appeal Board (PTAB). (Dkts. 49, 52, 55).

**The '740, '882, and '694 Patents**

The '740 Patent is a continuation of the '882 Patent, which is a continuation of U.S. Patent No. 9,982,694 (the '694 Patent). The '694 Patent's Figure 1 (left) and the '882 Patent's Figure 1 (right) are reproduced below:



In prosecuting the '694 and '882 Patents, ITW "emphasized that the invention was an improved seal designed to avoid 'stack-up' problems" that occurred with prior-art fasteners using "rigid seals" or relying on compression of the support panel and the bottom of the lower platform. (Dkt. 108 at 75 ¶ 173). The circular shape offers "the best adhesion for the overlying seal"; it is "the ideal shape . . . to seal circular openings," which are common in automotive construction. (*Id.* at 78 ¶¶ 182–83). The "stepped construction" of the circular lower platform helps prevent interference and maintain the seal. (*Id.* at 77–78 ¶¶ 181–82). ITW distinguished prior art by

pointing to the function of the fasteners' lower platform: creating and maintaining a seal with "substantially zero gap between the surface element and the support structure." (*Id.* at 76–77 ¶¶ 175–81). During normal use, Termax asserts, the "lower platform is hidden from view by the peripheral seal." (*Id.* at 78 ¶ 184).

In a final written decision on October 4, 2022, the PTAB invalidated the '882 Patent. (Dkt. 108 at 62 ¶ 129; Dkt. 108-6); *Termax LLC v. Ill. Tool Works Inc.*, No. IPR2021-00724, 2022 WL 5062060, at *1 (P.T.A.B. Oct. 4, 2022). The PTAB found the '882 Patent's Claims 1–7, 9–15, and 17–20 unpatentable over U.S. Patent No. 8,561,265 (the Benedetti reference, after inventor Steven Benedetti) and other references. *Termax*, No. IPR2021-00724, 2022 WL 5062060, at *25. Benedetti and other references "disclose[] all the limitations of [the '882 Patent's] claims 1–7, 9–15, and 17–20," the PTAB concluded. *Id.* at *24–25.

Relevant here, "Benedetti discloses a sealing foot disposed outboard from the second platform." (Dkt. 108 at 65 ¶ 134); *Termax*, No. IPR2021-00724, 2022 WL 5062060, at *21–22. The same language—"sealing foot . . . disposed outboard from the second platform"—appeared in Claim 1 of the '882 Patent, making it unpatentable. *Termax*, 2022 WL 5062060, at *5. Although ITW argued that the '882 Patent's claim required "a sealing foot disposed *entirely* outboard from the second platform," the PTAB found that construction unconvincing. *Id.* at *5–7, 21–22. Even if ITW's proposed construction of the "disposed outboard" limitation had been correct, a footnote in the PTAB's decision reasoned, Benedetti still discloses the limitation. *Id.* at *22 n.21.

ITW appealed. *See Ill. Tool Works, Inc. v. Termax Co.*, 2023 WL 2398751 (Fed. Cir. Mar. 8, 2023). While that appeal was pending, on October 17, 2022, this Court continued the stay as to the '882 patent but lifted the stay as to the D'826 Patent. (Dkt. 65 at 3).

4

Meanwhile, ITW pursued the '740 Patent. (*See* Dkt. 105-2). Attorney Nicholas Schmidbauer represented ITW in the application, which was filed on June 10, 2020. (Dkt. 108 at 61–62 ¶¶ 127–28). In September 2022, the patent examiner—"who had no involvement in the earlier IPR proceeding" on the '882 Patent—rejected the application, finding the '740 Patent's claims were not "patentably distinct" from the '882 Patent's claims. (*Id.* at 66, 70 ¶¶ 137, 153; Dkt. 116-1 at 2). On November 9, 2022, ITW amended the '740 Patent application's Claim 1, in pertinent part, to require a "sealing foot . . . disposed <u>entirely</u> outboard from the collar." (Dkt. 108 at 66 ¶ 138; Dkt. 116-1 at 3). According to Termax, ITW's addition of the word "entirely" to the "disposed outboard" limitation is "[t]he only material difference" between the '740 Patent's Claim 1 and the invalidated '882 Patent's Claim 1. (Dkt. 108 at 67 ¶ 141).

In a November 16, 2022 Information Disclosure Statement supporting the amended '740 Patent application, Schmidbauer cited the PTAB's decision invalidating the '882 Patent to the patent examiner, including the reference in a list of seven non-patent references. (Dkt. 116-1 at 9). Yet, Schmidbauer did not "draw the patent examiner's attention to" the PTAB's footnote suggesting that Benedetti's "disposed outboard" limitation would render unpatentable a claim of the same scope as Claim 1 of the '740 Patent. (Dkt. 108 at 68 ¶ 147). Schmidbauer instead tried to portray ITW's amendments to the '740 Patent as promoting "clarity"—urging the patent examiner to allow the amended claim "without further searching." (*Id.* at 69 ¶¶ 149–50, 153). ITW could have presented the same amendments to the PTAB during the IPR proceedings on the '882 Patent; but it did not. (*Id.* at 69 ¶ 151). As amended, the patent examiner allowed the '740 Patent's claims on February 23, 2023. (*Id.* at 67 ¶ 139; Dkt. 116-1 at 16–20).

After obtaining the '740 Patent, ITW withdrew its appeal of the PTAB's decision on the '882 Patent. *Ill. Tool Works*, 2023 WL 2398751. ITW then filed its Second Amended Complaint in this case, alleging infringement of the '740 Patent instead of the'882 Patent. (Dkt. 105).

**The D'826 Patent and the Scroggie Reference**

Setting up the present dispute over the D'826 Patent requires journeying further into the past. Back in August 2007, ITW filed U.S. Patent Application No. 11/891,700 (the '700 Application), later published as US 2008/0066266, entitled "Fastener Assembly," and its international counterpart, PCT/US2007/077064 (the PCT'064 Application), published as WO 2008/033667 A1 (collectively, the Scroggie reference, after inventor Derek Scroggie). (Dkt. 108 at 73–74 ¶¶ 166–67). Then, in December 2012, ITW filed U.S. Provisional Application No. 61/739,604 (the P'604 Application), entitled "Push Through Fastener with Integral Seal" and listing Scroggie as an inventor and applicant. (*Id.* at 80 ¶ 190). Both the '882 and '694 Patents claim priority to the P'604 Application. (*Id.* at 79 ¶ 188). Included in the P'604 Application were "figures of fasteners identical to those disclosed in the [Scroggie reference]." (*Id.* at 80 ¶ 191). ITW acknowledged in the P'604 Application that the Scroggie-reference fasteners were "prior art." (*Id.*) Further, more than one year before the D'826 Patent's earliest priority date of June 17, 2015, ITW offered for sale or sold fasteners embodying the Scroggie reference. (*Id.* at 80 ¶ 192).

On April 27, 2020, Schmidbauer, on ITW's behalf, filed the application for the D'826 Patent. (Dkt. 108 at 79 ¶ 185). As a design patent, the D'826 Patent's single claim is to "[t]he ornamental design for a fastener, as shown and described." (*Id.* at 71 ¶ 162). The D'826 Patent, like the '740 Patent, claims priority to the applications for the '882 and '694 Patents. (Dkt. 108 at 75 ¶ 171). Schmidbauer informed the Patent and Trademark Office (PTO) that the application for

6

the D'826 Patent was a continuation of the '882 Patent's application, which, in turn, was a continuation of the '694 Patent's application. (*Id.* at 79 ¶ 185).

In prosecuting the D'826 Patent, Schmidbauer told the PTO that he had searched for prior art related to the '882 Patent. (*Id.* at 81 ¶ 193). Since "the '882 Patent discloses a seal," though, "it was highly unlikely that the search results for its sealed configuration would uncover references that did not include a seal." (*Id.* at 79 ¶ 187). Although Schmidbauer and Derek Scroggie were aware of the Scroggie reference, the P'604 Application, and ITW's offering for sale of Scroggie-style fasteners, they did not disclose any of that prior art to the patent examiner, Termax claims. (*Id.* at 81 ¶¶ 193–94). Nor did Schmidbauer "call to the examiner's attention the P'604 Application." (*Id.* at 79 ¶ 188).

Below, side by side, are the D'826 Patent's Figure 1 (left)[1] and the Scroggie reference's Figure 4 (right):



FIG. 1                                                          FIG. 4

---

[1] The D'826 Patent's written description explains that the broken lines in Figure 1 indicate "unclaimed subject matter that forms no part of the claimed design."

"[T]he only noteworthy difference between the design[s] of D'826 and" the Scroggie reference, according to Termax, is the shape of the lower platform—circular (D'826) versus rectangular (Scroggie). (Dkt. 108 at 74 ¶ 168). Termax asserts further that the D'826 Patent's circular, stepped lower platform is "dictated primarily by function." (*Id.* at 74 ¶¶ 168–69).

In October 2021, while this action was stayed, Termax filed an additional IPR petition challenging ITW's D'826 Patent. *Termax Co. v. Ill. Tool Works Inc.*, No. IPR2022-00106, 2022 WL 1618056 (P.T.A.B. May 12, 2022). Termax argued that the Scroggie reference anticipated the D'826 Patent's design. *Id.* at *9. But the PTAB disagreed, applying the ordinary-observer test. *Id.* at *3 (explaining that one design anticipates another—rendering it unpatentable—if the second design, on whole, is so similar to the first as to deceive a typical consumer into a mistaken purchase).

The D'826 Patent's circular lower platform, the PTAB found, is "significant to the overall appearance of the fastener design." *Id.* The PTAB further disagreed with Termax's "premise that the lower platform's appearance is primarily dictated by function." *Id.* Termax's argument presumed that the fastener is "limited to use with a seal for a vehicle"—a faulty presumption because "a seal is not necessary for a generic fastener to hold two things together." *Id.* at *7. Nor did Termax offer any evidence supporting its contention that the circular lower platform was "hidden from view" "at all times during the fastener's normal use." *Id.* By contrast, ITW showed "that prior art fasteners are replete with lower platforms having a variety of appearances," undermining any inference that the appearance of the lower platform is "critical to its function." *Id.* at *8. Because Termax had no "reasonable likelihood of prevailing" on its theory that the Scroggie reference anticipated the D'826 Patent, the PTAB refused to institute IPR proceedings. *Id.* at *9, 14.

8

**Anticompetitive Allegations**

Going beyond patent validity and enforceability, several of Termax's allegations accuse ITW of anticompetitive conduct. ITW "is a global Fortune 200 company" with 46,000 employees in 51 countries, Termax alleges. (Dkt. 108 at 36 ¶ 11). In fiscal-year 2022, ITW reported $3.97 billion in revenue, $907 million in net income, and a market capitalization of $72.8 billion. (*Id.*) ITW's Deltar Fasteners division, which manufactures fasteners for the automotive industry, reported $3 billion in revenue for 2022 and owns overs 19,000 patents—including 3,200 in the automotive industry. (*Id.* at 36 ¶ 12). "Compared to the corporate behemoth that is ITW, Termax was, for nearly five decades following its founding in 1971, a family company . . . ." (*Id.* at 36 ¶ 13). ITW's Second Amended Complaint, Termax asserts, is part of ITW's "nearly five-year anticompetitive campaign." (*Id.* at 36 ¶ 14).

In October 2018, ITW accused Termax of infringing the '694 Patent and threatened to sue Termax unless it stopped selling certain fasteners. (*Id.* at 36 ¶ 15). But "Termax refused to be intimidated": Termax advised ITW that the accused fasteners lacked a "central stem," as the claims of the '694 Patent required. (*Id.* at 37 ¶ 16). ITW then "abandoned its allegations that Termax infringed upon the '694 Patent—a "sudden surrender" which revealed "ITW's original motive in seeking to intimidate Termax" with illegitimate infringement allegations. (*Id.* at 37 ¶ 17). "Not to be deterred, . . . ITW continued its threats" while prosecuting the '882 Patent. (*Id.* at 37 ¶ 18). In June 2020, leading up to this litigation, ITW accused Termax of infringing the '882 Patent. (*Id.*)

Pursuant to "an anticompetitive strategy to force Termax to discontinue sales of its accused product, Termax alleges, "ITW has persuaded the [PTO] to grant it a number of patents to which it is not entitled," and "maintained baseless allegations that Termax infringes upon these patents." (*Id.* at 35 ¶ 8). ITW "seeks to use its market position, and its disproportionate financial power, to

force Termax to quit" the automotive-fastener market, allowing ITW to "monopolize the market" and raise its prices. (*Id.* at 35 ¶ 9). In addition to being "tortious and illegal," Termax asserts, ITW's actions have forced Termax to incur attorneys' fees and suffer harm to its reputation and business. (*Id.* at 35 ¶ 10). Termax goes on to characterize ITW's present lawsuit as "sham litigation" and an effort to "monopolize" the sealing-fastener market. (*Id.* at 47–48 ¶¶ 46–53).

**The Present Motion**

On March 30, 2023, Termax filed its Answer and Counterclaim to ITW's Second Amended Complaint. (Dkt. 108). As to ITW's '740 and D'826 Patents, Termax's Counterclaim seeks declaratory judgment of non-infringement (Counts I & II); invalidity (Counts III & IV); and unenforceability for inequitable conduct (Counts V & VI). (Dkt. 108 at 49–83 ¶¶ 58–203). ITW now moves to dismiss Counts V and VI of Termax's Counterclaim. (Dkt. 112). ITW also moves to strike ¶¶ 8–18, 25, and 46–57 from Termax's Counterclaim as immaterial and impertinent. (*Id.*)

## LEGAL STANDARD

In patent cases, the Seventh Circuit's procedural standards apply. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009) ("[P]rocedural matter[s]" are "governed by the law of the regional circuit."); *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003) (reviewing "the dismissal of a claim under Rule 12(b)(6), a matter of procedure, by applying the law of the regional circuit"). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 627 (7th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hughes v. Nw.*

*Univ.*, 63 F.4th 615, 628 (7th Cir. 2023) (quoting *Iqbal*, 566 U.S. at 678). The Court "accept[s] all well-pleaded facts as true and draw[s] reasonable inferences in the [nonmovant's] favor." *Id.* at 630 (citations omitted). Yet, mere "labels and conclusions" are not enough. *Gonzalez v. McHenry County*, 40 F.4th 824, 827 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The pleading's factual content must "raise a right to relief above the speculative level." *Hughes*, 63 F.4th at 628 (quoting *Twombly*, 550 U.S. at 555).

While Seventh Circuit procedural standards apply, Federal Circuit law controls whether inequitable-conduct allegations pass muster. *Exergen*, 575 F.3d at 1318, 1326 (citing *Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (7th Cir. 2007)). Inequitable conduct—though "a broader concept than fraud"—requires pleading with particularity under Rule 9(b). *Id.* at 1326 (quoting *Ferguson Beauregard*, 350 F.3d at 1344); *see* Fed. R. Civ. P. 9(b). Thus, "in pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1327 (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

As to a motion to strike, Rule 12(f) gives the Court discretion to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009) (quoting Fed. R. Civ. P. 12(f)); *see also Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664–65 (7th Cir. 1992). Although motions to strike are disfavored where they "serve only to delay," in appropriate cases, striking "unnecessary clutter" may instead "serve to expedite." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989) (citing *United States v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir. 1975) (Clark, J.)). For instance, courts may strike allegations that bear

11

"no possible relation to the controversy or may cause the objecting party prejudice." *Talbot*, 961 F.2d at 664; *see also, e.g.*, *Gress v. Reg'l Transp. Auth.*, 2018 WL 3869962, at *5 (N.D. Ill. Aug. 15, 2018) (citing *Heller*, 883 F.2d at 1294).

## DISCUSSION

### I.      Motion to Dismiss

"Applicants for patents have a duty to prosecute patent applications in the Patent Office with candor, good faith, and honesty." *Honeywell Int'l v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007) (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995), and 37 C.F.R. § 1.56). Breaching that duty is inequitable conduct. *Id.* To state a claim for inequitable conduct, Termax must plead with particularity that: "(1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information; and (2) the individual did so with a specific intent to deceive the PTO." *Exergen*, 575 F.3d at 1327 n.3 (citations omitted); *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011).

Materiality and intent are distinct elements: courts "should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality and vice versa." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc) (citation omitted). In pleading the first element, "but-for materiality" is the standard. *Therasense*, 649 F.3d at 1291; *see also, e.g.*, *Kranos IP Corp. v. Riddell, Inc.*, 334 F. Supp. 3d 907, 913 (N.D. Ill. 2018). "When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense*, 649 F.3d at 1291.

A.    The '740 Patent (Counterclaim Count V)

No doubt, Termax has plausibly alleged that the PTAB's invalidation of the '882 Patent was but-for material to the decision on the '740 Patent. Although the PTAB rejected a proposed construction of the '882 Patent as requiring a "sealing foot disposed . . . entirely outboard"—the exact language in the '740 Patent—a footnote suggested that the PTAB believed the rejected construction would still be unpatentable. *Termax*, 2022 WL 5062060, at *21, 22 n.21. ITW cited the PTAB's '882 Patent decision to the patent examiner in proceedings on the '740 Patent, but the examiner allowed the '740 Patent's claims. Why she did so is not clear from the record. Maybe the examiner disagreed with the PTAB's suggestion on the rejected construction of the "disposed outboard" limitation. Maybe she skipped the footnotes. Either way, the but-for materiality of the PTAB's decision remains plausible. The unpatentability of the '882 Patent's claims over Benedetti, at least in theory, had the power to persuade the PTO that the '740 Patent's similar claims were unpatentable too.

But critically, ITW did not withhold the PTAB's decision invalidating the '882 Patent in pursuing the '740 Patent. Rather, ITW cited the material reference to the patent examiner. That fact dooms Termax's claim as pleaded. In *Fiskars, Inc. v. Hunt Manufacturing Co.*, the Federal Circuit ruled: "An applicant can not be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner." 221 F.3d 1318, 1327 (Fed. Cir. 2000); *see also Scripps Clinic & Rsch. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it can not be deemed to have been withheld from the examiner."), *overruled on other grounds by Abbott Laby's v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009). Neither must an applicant "stress to the examiner the relevance of" each cited reference

nor "tell the PTO twice about the same prior art, on pain of loss of the patent for inequitable conduct." *Fiskars*, 221 F.3d at 1327.

Termax's efforts to escape from under *Fiskars*'s broad rule are unavailing. In Termax's view, ITW had an obligation to do something more than cite the PTAB's adverse decision: ITW failed, in particular, to "draw the patent examiner's attention to" the PTAB's footnote explaining that Benedetti discloses a "disposed outboard" limitation of the same scope as the '740 Patent's claim. (Dkt. 108 at 68 ¶¶ 147, 155). But *Fiskars* expressly refused to impose such an obligation. *See Fiskars*, 221 F.3d at 1327 (reasoning that the PTO no longer requires applicants to "explain the relevance of the references listed"); *see also, e.g.*, *Nevro Corp. v. Bos. Sci. Corp.*, 2017 WL 7795778, at *1 (N.D. Cal. Oct. 4, 2017) (striking inequitable-conduct claim as inadequately pleaded where patent owner did not clear up the patent examiner's apparent misunderstanding of a cited material reference).

Nonetheless, Termax asserts that this case, unlike *Fiskars*, involves "affirmative egregious misconduct." (Dkt. 116 at 13). Its allegations do not suggest as much. *Cf. Therasense*, 649 F.3d at 1292–93 (explaining that "filing of an unmistakably false affidavit" is "egregious"—unlike "mere nondisclosure of prior art references"). Of course, affirmative misrepresentations can be actionable as inequitable conduct. *See Fiskars*, 221 F.3d at 1326 ("[S]ubmitting false material information . . . with the intent to deceive or mislead the examiner into granting the patent" is inequitable conduct."). Termax here harps on ITW's counsel Schmidbauer's characterization of the amendments to the '740 Patent application as promoting "clarity" and his request that the examiner allow the claims "without further searching." (Dkt. 116 at 14). Accepting Termax's contention that the '740 Patent's "asserted claims were incompatible with the views of the PTAB," however, does not permit a reasonable inference that Schmidbauer's remarks were false. (*See id.*) At worst,

Schmidbauer's statements were attorney argument—not actionable misrepresentations. *See Rothman v. Target Corp.*, 556 F.3d 1310, 1328–29 (Fed Cir. 2009) ("While the law prohibits genuine misrepresentations of material fact, a prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct."); *cf. CoStar Realty Info., Inc. v. CIVIX-DDI, LLC*, 946 F. Supp. 2d 766, 779 (N.D. Ill. 2013) (finding inequitable conduct plausible where an applicant "omitted material references in response to the PTO's specific request for assistance in identifying" which of the applicant's earlier cited references were relevant).

Nor has Termax plausibly alleged inequitable conduct based on "burying" a reference. Allegations that an applicant buried a material reference with deceptive intent may give rise to a viable inequitable-conduct claim. *See Molins*, 48 F.3d at 1184 ("'[B]urying' a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith." (citation omitted)); *e.g.*, *SynQor, Inc. v. Cisco Sys., Inc.*, 2012 WL 12892779, at *5 (E.D. Tex. Aug. 7, 2012) ("Some cases have held that it was inequitable conduct to bury the most pertinent references within a large list of less pertinent references, particularly if the circumstances are such that the examiner would not carefully examine the art in the list." (quoting *Reid-Ashman Mfg., Inc. v. Swanson Semiconductor Serv., LLC*, 2007 WL 1394427, at *7 (N.D. Cal. May 10, 2007))), *report and recommendation adopted*, 2012 WL 3984865 (E.D. Tex. Sept. 11, 2012); *see also CoStar*, 946 F. Supp. 2d at 779 ("[T]he Federal Circuit has not established definitively whether or under what circumstances burying may constitute inequitable conduct."). But here, ITW listed the PTAB's adverse '882 Patent decision among only six other non-patent references. That is a far cry from burying—let alone with deceptive intent. *Cf. SynQor*, 2012 WL 12892779, at *6 (counterclaimant stated an inequitable-conduct claim where the patent owner buried, in a

"list of 1000+ references," an IPR decision invalidating a patent—three months before expanding the application to include claims similar to those invalidated).

Moreover, "[a]bsent proof to the contrary," the Court must "assume that the examiner did consider the references" ITW cited to her. *See Molins*, 48 F.3d at 1184 (citing *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990)). Although the patent examiner rejected ITW's original '740 Patent application and did not explain why she allowed the amended claims, Termax does not plausibly allege that ITW deprived the examiner of a meaningful opportunity to review its reference to the PTAB's '882 Patent decision. ITW cited the decision invalidating the '882 Patent on November 16, 2022, one week after amending its claims. Without more, that delay does not indicate foul play—especially considering the patent examiner did not allow the amended claims of the '740 Patent until three months later, on February 23, 2023. Even if the examiner chose to overlook the '882 Patent decision, Termax's allegations do not approach the high bar of pleading with particularity that ITW withheld the material reference and did so with specific intent to deceive the examiner.

Termax argues ITW's conduct was inequitable because it ran afoul of 37 C.F.R. § 42.73(d)(3), which precludes applicants from "obtaining in any patent . . . [a] claim that is not patentably distinct from a finally refused or canceled claim." (Dkt. 116 at 12–14). This argument fails too. Assuming *arguendo* that the amended '740 Patent is not, as a matter of law, patentably distinct from the '882 Patent, Termax's allegations do not plausibly suggest that ITW specifically intended to deceive the patent examiner by arguing otherwise. Similarly unavailing is Termax's assertion that ITW failed to comply with 37 C.F.R. 42.8(b)(2), which requires disclosure to the PTAB of "any other judicial or administrative matter that would affect, or be affected by, a decision in the proceeding." (*See* Dkt. 116 at 9). Even if Termax breached its regulatory duty to alert the

PTAB of its parallel pursuit of the amended '740 Patent in a separate proceeding, that shortfall does not suggest that ITW withheld any material information from the patent examiner in prosecuting the '740 Patent. Nor does Termax cite any case law suggesting that ITW's alleged failure to comply with these regulatory obligations amounts to inequitable conduct *per se*.

In sum, the patent examiner's decision allowing the '740 Patent's amended claim may be hard to square with the PTAB's decision invalidating the '882 Patent. But ITW gave the examiner all the material information to decide whether the '740 Patent's claims were patentable. Federal Circuit precedent requires no more. *See Fiskars*, 221 F.3d at 1327. Termax's allegations do not permit a reasonable inference that ITW, with intent to deceive the patent examiner, withheld material information or made any affirmative misrepresentation of material fact. As to the '740 Patent, therefore, Termax's inequitable-conduct claim fails.

### B. The D'826 Patent (Counterclaim Count VI)

Termax also fails to plead that ITW obtained the D'826 Patent through inequitable conduct. Although ITW did not cite the Scroggie reference to the patent examiner, the PTAB's later refusal to institute IPR proceedings is strong evidence that the Scroggie reference was not but-for material. *See Termax*, 2022 WL 1618056. Since the PTAB found that the Scroggie reference did not anticipate the D'826 Patent—rejecting arguments Termax repeats before this Court—Termax must battle uphill to plausibly allege that the PTO would have found the D'826 Patent unpatentable over the Scroggie reference.

Termax is correct that the PTAB's refusal to institute IPR does not, as a matter of law, preclude it from demonstrating the Scroggie reference's materiality. *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985) (explaining that the PTO's decision on a patent's validity "is never binding on the court," which has an "obligation . . . to reach an

independent conclusion" (quoting *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed. Cir. 1985))); *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1341 (Fed. Cir. 2018) ("While the PTO's findings during reexamination are 'evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence,' they are not dispositive." (quoting *Fromson*, 755 F.2d at 1555); *see also, e.g.*, *Jaguar Land Rover Ltd. v. Bentley Motors Ltd.*, 2021 WL 755479, at *3 (E.D. Va. Feb. 16, 2021) (despite the PTAB's IPR-petition denial, "the Court could, in theory, reach a contrary decision to the PTAB regarding materiality based on a more robust record and different arguments"). But it does not help Termax's case that the PTAB found Termax had no "reasonable likelihood" of demonstrating the D'826 Patent's invalidity based on the Scroggie reference. *See Termax*, 2022 WL 1618056, at *9. Rather, the PTAB's decision strengthens the presumption of the D'826 Patent's validity. *See* 35 U.S.C. § 282; *Exmark*, 879 F.3d at 1341 (noting that a presumption of patent validity reflects statutorily prescribed deference to the PTO).

To the extent Termax now rehashes arguments previously raised before the PTO, it must show that the PTO's decision was wrong. *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008). Because Termax relies only on prior art and evidence which the PTAB already considered, it "has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011) (quoting *PowerOasis*, 522 F.3d at 1304). Termax's allegations do not raise a plausible inference that it can meet this burden.

In Termax's view, the PTAB erred in construing the D'826 Patent as claiming "a fastener design suitable for use without a seal" because the seal is functionally essential to the'882 Patent— to which the D'826 Patent claims priority. (Dkt. 116 at 16–17). Termax points to *Best Lock Corp.*

18

*v. Ilco Unican Corp.*, which held that the district court committed no clear error in finding that a "claimed key blade design was dictated solely by the key blade's function." 94 F.3d 1563, 1566 (Fed. Cir. 1996). Termax also relied on *Best Lock* in challenging the D'826 Patent before the PTAB—reliance the PTAB found "misplaced." *Termax*, 2022 WL 1610856, at *7. Distinguishing *Best Lock*, the PTAB explained that "a lock is necessary for a key to function," while "a seal is not necessary for a generic fastener to hold two things together." *Id.* at *7. That distinction is persuasive.

Although the '882 Patent discloses a seal, the D'826 Patent does not. A design patent claims the solid lines—but not the broken lines—of its drawing. *In re Maatita*, 900 F.3d 1369, 1372 (Fed. Cir. 2018). Since an amended design patent may alter the design's scope—"by either converting originally-disclosed solid line structure to broken lines" or vice versa—without "introduc[ing] new matter," it follows that a design patent may claim priority to an earlier utility patent without being identical in scope. *See* Manual of Patent Examining Procedure § 1504.04. Termax offers no support for its contention that the D'826 Patent, by virtue of claiming priority to the '882 Patent, necessarily comprises identical functional disclosures.[2] The PTAB did not seem to think so, despite its awareness that the D'826 Patent claims priority to the '882 Patent. *See Termax*, 2022 WL 1618056, at *1. Notwithstanding Termax's new spin on a rejected theory, its allegations fail to plausibly suggest that the PTAB wrongly construed the D'826 Patent.

Nor did the PTAB err in rejecting Termax's argument that the lower platform's design is unpatentable because it is hidden during normal use. (*See* Dkt. 116 at 17). As the PTAB observed, "[t]he validity of a patent design does not require that the article be visible throughout its use."

---

[2] *Agilent Technologies, Inc. v. Affymetrix, Inc.*—the only case Termax cites on this point (*see* Dkt. 116 at 17 n.5)—observed that "continuing applications . . . can only receive the benefit of an earlier-filed parent application if that parent fully supports the claims." 567 F.3d 1366, 1383 (Fed. Cir. 2009). Nothing in *Agilent* suggests that a continuing application must claim the *entirety* of its parent application.

*Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1368 (Fed. Cir. 1999); *Termax*, 2022 WL 1618056, at *7; *see also, e.g.*, *Larson v. Classic Corp. Eyeglasses*, 683 F. Supp. 1202, 1202–03 (N.D. Ill. 1988) (observing that a feature's visibility during normal use is "not a statutory requirement": what matters is "whether that feature has some aesthetic, as opposed to purely functional or utilitarian, qualities"). The PTAB reasoned further that the variety of appearances among lower platforms in prior-art fasteners evidenced the ornamental nature of the platform's appearance—undermining Termax's position. *Termax*, 2022 WL 1618056, at *8; *see Best Lock*, 94 F.3d at 1566 ("A design is not dictated solely by its function when alternative designs for the article of manufacture are available."); *accord L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993). Termax makes no effort to refute this point, and its allegations do not permit a reasonable inference that the PTAB was wrong.

Before the PTAB, moreover, Termax failed to present any supporting evidence that the fastener's lower platform is, in fact, hidden during normal use. *Termax*, 2022 WL 1618056, at *7. Imagining that ITW had cited the Scroggie reference in pursuing the D'826 Patent, none of Termax's allegations plausibly suggest that the patent examiner would have uncovered evidence of the fastener's lower platform being hidden while in use. Since Termax was unable to find such evidence to support its IPR petition—and there is no indication that it could do so now—there is a critical link missing from the logical chain between Termax's allegations and a plausible inference of the Scroggie reference's but-for materiality. Termax has not sufficiently pleaded that the Scroggie reference was material to the D'826 Patent, so its inequitable-conduct claim fails.[3]

---

[3] The Court need not reach ITW's arguments on Termax's failure to plead knowledge and intent. (Dkt. 113 at 15–17).

## II.        Motion to Strike

Finally, ITW moves to strike ¶¶ 8–18, 25, and 46–57 of Termax's Counterclaim under Rule 12(f) as immaterial or impertinent. The contested paragraphs describe ITW's purported "anticompetitive campaign against Termax" and characterize the present action as "sham litigation." (Dkt. 108 at 35–38, 47–48 ¶¶ 8–18, 25, 46–57). Yet, these factual allegations are not relevant to any of Termax's substantive defenses or counterclaims. In ITW's view, these irrelevant paragraphs are unfairly prejudicial since they could damage its reputation, chill competition, or scare away customers. (Dkt. 113 at 19; Dkt. 117 at 19). The Court agrees that the challenged paragraphs are immaterial and have the potential to prejudice ITW. *See Talbot*, 961 F.2d at 664. Striking the anticompetitive and sham-litigation paragraphs from Termax's Counterclaim may expedite this litigation by trimming "unnecessary clutter" and focusing the issues. *See Heller*, 883 F.2d at 1294.

Contrary to Termax's contention, none of the paragraphs in question are helpful in framing the issues, facts, or procedural history. (*See* Dkt. 116 at 20). Also unpersuasive is Termax's underdeveloped point that the contested paragraphs will later support its showing that this is an "exceptional" case, warranting attorneys' fees under 35 U.S.C. § 285. (*See id.*) "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). The Court will have ample discretion to resolve a future exceptional-case determination by "considering the totality of the circumstances"—a determination which does not lend itself to any "precise rule or formula." *Id.*; *see also Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1357 (Fed. Cir. 2019).

There does not appear to be any rule limiting an exceptional-case determination to the factual allegations in the pleadings. *See Thermolife*, 922 F.3d at 1357 (observing that "a fuller explanation of the court's" exceptional-case determination may be necessary "when a district court focuses on a freshly considered issue" instead of "one that has already been fully litigated"); *Univ. of Utah v. Max-Planck-Gesselschaft zur Foerderung der Wissenschaften e.V.*, 851 F.3d 1317, 1323 (Fed. Cir. 2017) (observing that the district court had no obligation to even explain what considerations factored into its finding that the case was unexceptional). If necessary, Termax may later request a hearing or submit evidence relevant to a petition for attorneys' fees. For now, however, Termax's vague suggestion that its otherwise immaterial allegations will somehow support its eventual fee petition does not hold water. Accordingly, the Court grants ITW's motion to strike in its entirety.

## **CONCLUSION**

For the reasons above, ITW's partial motion to dismiss and motion to strike [112] are granted. Counterclaim Counts V and VI are dismissed without prejudice for failure to state a claim. Paragraphs 8–18, 25, and 46–57 of Termax's Counterclaim are stricken. Termax may amend its Counterclaim consistent with this Opinion by August 14, 2023.

Virginia M. Kendall
United States District Judge

Date: July 24, 2023